**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 19 B 21730 |
| | ) | |
| LINDA STAMPS, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | Judge David D. Cleary |

**MEMORANDUM OPINION**

This matter comes before the court on the motion of the City of Chicago ("City") to

enforce confirmed plan and for declaratory relief ("Motion").  Marilyn O. Marshall, Standing

Chapter 13 Trustee ("Trustee"), opposed the Motion.  The court entered a briefing schedule, and

the parties timely filed their response ("Response") and reply ("Reply").  Having read the papers

and heard the arguments of the parties, the court will deny the Motion.

## I.      INTRODUCTION

In the Motion, and in the briefs supporting and opposing it, the parties ask the court to

interpret certain language in the national form chapter 13 plan and the plan confirmed in this

case:

> If relief from the automatic stay is ordered as to any item of collateral listed in this
> paragraph, then, unless otherwise ordered by the court, all payments under this
> paragraph as to that collateral will cease, and all secured claims based on that
> collateral will no longer be treated by the plan.

Official Form 113 ("Form 113"), section 3.1.

To persuade the court to adopt their reasoning, each party debates the importance and

meaning of different canons of construction and interpretation.  But, such an exercise is

unnecessary.  "Where the language is plain and admits of no more than one meaning, the duty of

interpretation does not arise, and the rules which are to aid doubtful meanings need no

discussion."  *Caminetti v. United States*, 242 U.S. 470, 485 (1917).  *See, e.g., Lamie v. U.S.*

*Trustee*, 540 U.S. 526, 536 (2004) (The plain meaning "approach respects the words of

Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more

controversial realm of legislative history."); *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S.

120, 123 (1989) ("We give the Federal Rules of Civil Procedure their plain meaning, and

generally with them as with a statute, when we find the terms ... unambiguous, judicial inquiry is

complete[.]") (citation and quotation omitted).

Accordingly, this court's task is to determine whether the plain meaning of this language

in Form 113 is unambiguous. Reading Form 113 as a whole, and as confirmed in this case and

applied to these parties, the meaning of the language at issue is plain. The court will not alter the

terms of Debtor's confirmed plan by enforcing the interpretation presented by the City. The

Motion will be denied.

## II.    BACKGROUND

Debtor Linda Stamps ("Debtor") filed for relief under chapter 13 of the Bankruptcy Code

on August 1, 2019. She filed a proposed plan about two weeks later. Debtor then brought a

motion to extend stay, and the court granted it without objection. Early in the case, she filed

objections to two proofs of claim, one of which was mooted and the other withdrawn. The

Trustee filed a motion to dismiss for unreasonable delay, which serves as an objection to

confirmation in this district. Capital One Auto Finance ("Capital One") filed an objection to

confirmation.

Debtor eventually filed an amended plan ("Plan"). The Trustee withdrew her motion to

dismiss, the court confirmed the Plan on December 9, 2019, and on the same day, entered a

minute order modifying the Plan to resolve Capital One's objection.

2

Among other provisions, the Plan treats the claim of Ocwen Loan Servicing ("Ocwen") in section 3.1.[1] Ocwen's claim is secured by a mortgage on the real property at 5307 S. Hermitage Avenue in Chicago (the "Hermitage Property"). The Plan provides for Debtor to make direct monthly payments to Ocwen to maintain her current contractual obligation, and for the Trustee to make disbursements to Ocwen on its $30,715.62 arrearage.

In section 3.2, the Plan treats the claim of the City, secured by the Hermitage Property. The Plan estimates the City's claim at $9,203 and provides for the Trustee to make disbursements to the City of $153.38 each month during the 60-month Plan term. The Plan as modified by the minute order treats Capital One's claim, secured by a 2017 Ford C-Max Hybrid, in section 3.3.

On December 27, 2019, Ocwen filed a motion for relief from the automatic stay. About a month later, the Debtor and Ocwen entered into the Agreed Repay Order with Provision for Stay Relief Upon Default ("Repay Order").

The Repay Order states that if Ocwen does not receive any one scheduled payment and Debtor does not bring the loan current within a certain period of time, "the stay shall be automatically terminated … upon filing of notice of same with the clerk of the court[.]" On November 16, 2020, Ocwen filed a notice of default under the Repay Order. According to the terms of the Repay Order, the stay automatically terminated.

Some time after the stay terminated, the Trustee stopped making the $153.38 monthly payments to the City. On February 22, 2022, the Trustee sent a letter and email to the City demanding the return of $306.76. In the email, the Trustee wrote:

---

[1] The creditor that filed the proof of claim is Deutsche Bank National Trust Company, as trustee for Morgan Stanley ABS Capital I Inc. Trust 2007-HE3 Mortgage Pass-through Certificates, Series 2007-HE3. The claim form indicates that notices should be sent to PHH Mortgage. For simplicity's sake, the court will refer to this creditor as Ocwen, the name used in the Plan.

On 11/16/2020 a Notice of Default and Modification of the Automatic Stay was filed, providing stay relief to Deutsche Bank National Trust Company in regards to the property located at 5307 S Hermitage Ave, Chicago, IL 60609.

The property address is listed in section 3.1 of the plan.

Once the notice was filed on 11/16/2020 all payments on an [sic] claim secured by the referenced property should have ceases [sic].

The Trustee's office disbursed funds in the amount of $306.76 on 11/20/2020.

Therefore the Trustee is requesting a refund in the amount of $306.76.

The City has not returned the requested refund to the Trustee, but instead brought the

Motion.

### III.    CONTENTIONS OF THE PARTIES

In the Motion, the City seeks an order declaring the following:

1. Notwithstanding any purportedly contrary language in paragraph 3.1 of the Plan, the City was at all times, and is going forward, entitled to its set payment under paragraph 3.2 of the Plan;

2. The City is not required to turn over or disgorge to the Trustee the $306.76 she has demanded; and

3. The Trustee must continue making payments to the City as provided for in paragraph 3.2 of the Plan and must take all reasonable actions to make up for payments that she did not make to the City under that paragraph.

(*See* EOD 61, Proposed Order.)

In support of its position that the Trustee's interpretation of the effect of stay relief on its treatment by the Plan is flawed, the City puts forth three arguments.  First, that the Trustee's position conflicts with three canons of construction: (1) the surplusage canon; (2) the general/specific canon; and (3) the harmonious-reading canon.  Second, that the Trustee's

4

interpretation would undercut the notice and clarity that Form 113 is intended to provide.

Finally, that stopping payments to all creditors secured by property for which the stay is lifted

would violate 11 U.S.C. § 1325(a)(5)(B) and render Form 113 unconfirmable.

In opposition to the City, the Trustee focuses on the "ordinary, plain reading of the text of

the plan[.]" Response, p. 3.  She responds to each of the City's arguments, but urges "the Court

… [to] focus on the text itself and the purpose behind the text."  *Id.*, p. 7.

### IV.    DISCUSSION

#### A.  Jurisdiction

##### 1.  Authority to enter declaratory judgment

The court will first address its jurisdiction to hear the Motion.  The City requests entry of

a declaratory judgment.  So long as a movant's requested relief is limited "to cases of actual

controversy, that is, actual legal disputes," *Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496,

499 (7th Cir. 2014) (citation and quotation omitted), courts may issue declaratory judgments.

*See* 28 U.S.C. § 2201(a). "[T]he bankruptcy court has the power to issue declaratory judgments

when the matter in controversy regards the administration of a pending bankruptcy estate."

*Sears, Roebuck & Co. v. O'Brien*, 178 F.3d 962, 964 (8th Cir. 1999).  *See Walden Inv. Grp. v.*

*First Nations Bank* (*In re Montemurro*), 580 B.R. 490, 493 (Bankr. N.D. Ill. 2017) ("Declaratory

judgments … are clearly within the court's general authority.").

A request for a declaratory judgment, however, requires the filing of an adversary

proceeding.  *See* Fed. R. Bankr. P. 7001(9).  Putting aside this requirement, which the Trustee

has not raised, the Motion also requests enforcement of the confirmed Plan.  The court will

decide the limited issue of enforcement of a plan provision in this case and under this Plan.

5

## 2. Effect of a confirmed plan

The title of 11 U.S.C. § 1327 is Effect of Confirmation.  "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a).  Upon confirmation, therefore, Debtor and all of her creditors, including the City, became bound to the terms of the Plan.

After confirmation of a chapter 13 plan, its provisions are implemented over a number of years by the chapter 13 trustee.  *See* 11 U.S.C. § 1302 (describing the duties of a chapter 13 trustee).  A chapter 13 case concludes only after: (1) all payments are complete and a discharge is entered; (2) the case is converted; or (3) the court dismisses it.

## 3. The court has jurisdiction to enforce a confirmed plan

The court has "jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).  This includes the authority to enforce the provisions of a confirmed plan.  *See In re Chagolla*, 544 B.R. 676, 680 (B.A.P. 9th Cir. 2016) ("Based on Debtors' confirmed plan … the bankruptcy court retained jurisdiction over the matter to 'implement' or 'enforce' the plan confirmation order."); *In re Kimball Hill, Inc.*, 565 B.R. 878, 890 (Bankr. N.D. Ill. 2017) ("the Seventh Circuit has made clear that bankruptcy courts have the authority to enforce plan provisions"), *vacated in part on other grounds sub nom. Fid. and Deposit Co. of Maryland v. TRG Venture Two, LLC*, 2019 WL 5208853, at *2 (N.D. Ill. Oct. 16, 2019) (finding that the bankruptcy court had subject matter jurisdiction over the motion to enforce the plan, but vacating and remanding so that the court could make a determination under the standard articulated in a Supreme Court case decided while the appeal was pending); *In re*

*Losada*, 557 B.R. 244, 252 (Bankr. S.D. Fla. 2016) ("As many other courts have noted, I have continuing jurisdiction to interpret and enforce a bankruptcy plan.").

### 4. 11 U.S.C. § 105(a) aids the court in enforcing its orders

In addition to the court's authority to implement, interpret and enforce its own orders, 11 U.S.C. § 105(a) provides the court with a *statutory* basis for enforcing provisions of a confirmed chapter 13 plan.

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*See In re Roberts*, 632 B.R. 719, 723 (Bankr. D.S.C. 2021) ("Continued retention of this overpayment by Titan is a violation of the terms of the confirmed plan requiring disgorgement and turnover of those funds to the Trustee pursuant to both § 521(j) [sic] and the Court's inherent authority to enforce its orders and the Bankruptcy Code under § 105(a) to ensure the disbursements are consistent with the terms of the plan.").

"Section 105(a) confers authority to 'carry out' the provisions of the Code," so long as the court is not exercising that authority "by taking action that the Code prohibits." *Law v. Siegel*, 571 U.S. 415, 421 (2014). *See In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004) ("This does not create discretion to set aside the Code's rules about priority and distribution; the power conferred by § 105(a) is one to implement rather than override."). *See also Sunbeam Prods., Inc. v. Chicago Am. Mfg., LLC*, 686 F.3d 372, 376 (7th Cir. 2012) ("Rights depend … on what the Code provides rather than on notions of equity."). Enforcing the terms of a confirmed plan is not prohibited by the Code but is instead an integral part of implementing the complicated

7

and delicately balanced chapter 13 process.  *See* 11 U.S.C. §§ 1302, 1326, 1327; Fed. R. Bankr. P. 3015.1, 9009.

For all of these reasons, the court has jurisdiction to interpret and enforce its confirmation order by resolving the Motion.  The burden of proof is on the City, as the movant.  *See, e.g., Kimball Hill*, 565 B.R. at 891 ("The general standard in litigation is that the movant bears the burden of proof….  The same standard applies when a movant is trying to enforce a provision of a confirmed chapter 11 plan.") (citations omitted).  The measure of the City's burden is the preponderance of the evidence standard.

## B.  Form and Structure of the Plan

### 1.  Form plans

#### a.  History of the national form plan

Prior to 2017, there was no national standard form available for a chapter 13 plan. "Research demonstrated that there were nearly as many different forms for the Chapter 13 plan as there were bankruptcy courts, judges and Chapter 13 trustees."  Keith M. Lundin, *Lundin on Chapter 13*, § 72.5, at ¶ 6 (16th ed. 2022) ("Lundin") (footnote omitted).  Over a number of years, various iterations of a model plan were drafted and discarded.  Eventually, the Advisory Committee on Bankruptcy Rules ("Advisory Committee") appointed a Form Plan Working Group ("Working Group") that

> invested nearly three years in the development of an Official Form for the Chapter 13 plan. They collected hundreds of Chapter 13 plans from across the country to identify and blend the best parts. The Working Group identified many rules of bankruptcy procedure that needed to be changed to bring sanity and consistency to the Chapter 13 plan confirmation process. The Form Plan Working Group reached out through public hearings and innumerable informal networks and contacts to every corner of the Chapter 13 world—debtors, creditors, attorneys, trustees, judges, consumer groups, academics and the public at large. Several drafts of a form Chapter 13 plan were published, subjected to comment and hearings.

Lundin, § 72.5, at ¶ 18.

For various reasons not necessary to understand for resolution of the issue before this court, the Judicial Conference approved Form 113,[2] but did not make its use mandatory. Although Fed. R. Bankr. P. 9009(a) provides that "[t]he Official Forms prescribed by the Judicial Conference of the United States shall be used without alteration, except as otherwise provided in these rules, in a particular Official Form, or in the national instructions for a particular Official Form[,]" there is an exception adopted in 2017 just for chapter 13 plans.

> Notwithstanding Rule 9029(a)(1), a district may require that a Local Form for a plan filed in a chapter 13 case be used instead of an Official Form adopted for that purpose if the following conditions are satisfied:
>
> > (a) a single Local Form is adopted for the district after public notice and an opportunity for public comment;
> >
> > (b) each paragraph is numbered and labeled in boldface type with a heading stating the general subject matter of the paragraph;
> >
> > (c) the Local Form includes an initial paragraph for the debtor to indicate that the plan does or does not:
> >
> > > (1) contain any nonstandard provision;
> > >
> > > (2) limit the amount of a secured claim based on a valuation of the collateral for the claim; or
> > >
> > > (3) avoid a security interest or lien;
> >
> > (d) the Local Form contains separate paragraphs for:
> >
> > > (1) curing any default and maintaining payments on a claim secured by the debtor's principal residence;
> > >
> > > (2) paying a domestic-support obligation;
> > >
> > > (3) paying a claim described in the final paragraph of § 1325(a) of the Bankruptcy Code; and

---

[2] "The Official Forms, like the Interim Bankruptcy Rules, were promulgated by the Rules Committee and approved by the Judicial Conference of the United States. Both the Rules and the Official Forms share the presumption of validity." *In re Osei*, 389 B.R. 339, 354 (Bankr. S.D.N.Y. 2008) (quotation omitted).

(4) surrendering property that secures a claim with a request that the stay under §§ 362(a) and 1301(a) be terminated as to the surrendered collateral; and

(e) the Local Form contains a final paragraph for:

(1) the placement of nonstandard provisions, as defined in Rule 3015(c), along with a statement that any nonstandard provision placed elsewhere in the plan is void; and

(2) certification by the debtor's attorney or by an unrepresented debtor that the plan contains no nonstandard provision other than those set out in the final paragraph.

Fed. R. Bankr. P. 3015.1.

### b. Forms used within the Seventh Circuit

Although "Official Form 113 presents a uniform format designed to facilitate an efficient and cost-effective review by creditors," *In re Moore*, 619 B.R. 35, 37 (Bankr. W.D.N.Y. 2020), Rule 3015.1 allows districts to create their own, local form.[3]  The U.S. Bankruptcy Court for the Northern District of Illinois elected to require debtors to use Form 113 in all cases filed or converted to chapter 13 on or after December 1, 2017.  *See*

https://www.ilnb.uscourts.gov/news/announcement-use-national-chapter-13-plan (accessed September 28, 2022).  Some of the other districts within the Seventh Circuit chose to adopt local form plans.  *See* Bankr. E.D. Wis. L.R. 3015(a) ("All Chapter 13 debtors must use the Chapter 13 model plan included in the Appendix to these Local Rules."); Bankr. W.D. Wis. L.R. 3015-1(a) ("the initial, amended and modified Chapter 13 plan shall conform to Wisconsin Western Local Form 3015-1.1").  *See also In re Flinn*, 615 B.R. 313, 321 (Bankr. D. Kan. 2020) ("The courts of this District didn't adopt the national form, opting instead for a Kansas-grown form

---

[3] "Working from the same statute—the same mandatory and permissive provisions—and using the same federal rules and official forms, logic, efficiency and good public policy dictate that all bankruptcy courts should use the same form for the Chapter 13 plan. Not happening. In spite of decades of effort by many in the bankruptcy community, local culture dominates the form of the Chapter 13 plan. The only reliable way to know what form to use is to consult the local rules and/or the trustee in each district."  Lundin, § 72.5, at ¶ 1 (footnotes omitted).

10

plan devised by a committee of practitioners, trustees, and judges as they are authorized to do by Rule 3015.1.") (footnote omitted).

### 2. Structure

#### a. Confirmation process for every plan must follow the Bankruptcy Code

Regardless of whether a district uses Form 113 or a local form, the confirmation process is governed by the Bankruptcy Code. The chapter 13 debtor shall file a plan. 11 U.S.C. § 1321. And unlike in chapter 11 cases, *only* the chapter 13 debtor can file the plan.[4] The plan must contain certain provisions, and it may contain many others. 11 U.S.C. §§ 1322, 1325. *See Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 956 (1997) ("To qualify for confirmation under Chapter 13, the Rashes' plan had to satisfy the requirements set forth in § 1325(a) of the Code."). If the plan meets the Code's requirements, the bankruptcy court *shall* confirm it. 11 U.S.C. § 1325(a). Once a plan is confirmed, its provisions are binding on "the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a).

#### b. Form 113

As discussed above, the U.S. Bankruptcy Court for the Northern District of Illinois elected to use Form 113. Debtor's confirmed plan is, in fact, Form 113, personalized with the information specific to her case.

Form 113 contains nine parts. Part 1 provides warnings to debtors and, separately, to creditors. It highlights matters that may be of particular importance, and also provides a general note of caution to creditors: "You should read this plan carefully and discuss it with your

---

[4] Interestingly, at any time after confirmation but before payments are complete, the plan may be modified "upon request of the debtor, *the trustee, or the holder of an allowed unsecured claim*[.]" 11 U.S.C. § 1329(a) (emphasis added). So, while only the debtor can file and confirm a plan, other parties can seek modification any time after confirmation.

11

attorney if you have one in this bankruptcy case…. If you oppose the plan's treatment of your claim or any provision of this plan, you or your attorney must file an objection to confirmation[.]"

Part 3 is titled "Treatment of Secured Claims." Within Part 3 are five sections, two of which are particularly relevant to the issue before the court:

- Section 3.1 addresses secured claims for which the debtor intends to maintain installment payments and, often, to cure an arrearage. As described above, Debtor's Plan treats Ocwen's claim in section 3.1.

- Section 3.2 addresses other secured claims. This section may include a request for valuation of security, payment of fully secured claims, and modification of undersecured claims. As described above, in section 3.2 the Plan treats the claim of the City, secured by the Hermitage Property.

The drafters of Form 113 faced a tension common to many creators of generic forms – how to draft a document that was simple yet allowed for flexibility to address the unique situation that each particular debtor might face. Their solution was the inclusion of Part 8, titled "Nonstandard Plan Provisions." As used in Form 113, "nonstandard provision" is defined as "a provision not otherwise included in the Official … Form or deviating from it." Fed. R. Bankr. P. 3015(c).

Debtors may choose to negotiate with their creditors to provide treatment beyond what Form 113 contains, consistent with the Bankruptcy Code. *See, e.g., United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 278 (2010) ("[I]n some cases, a debtor and creditor may agree that payment of a student loan debt will cause the debtor an undue hardship sufficient to justify discharge. In such a case … [n]either the Code nor the Rules prevent the parties from stipulating

to the underlying facts of undue hardship[.]").  So long as the debtor checks the box in section

1.3 indicating that their plan includes nonstandard provisions, they may address any number of

issues not covered by Form 113.  Fed. R. Bankr. P. 3015.1(e) requires local form plans to contain

a paragraph for the placement of nonstandard provisions.

### c.  Debtor's Plan

Since Debtor's Plan treats a claim in section 3.1, it includes the following language,

which is the sentence at issue in the Motion:

> If relief from the automatic stay is ordered as to any item of collateral listed in this
> paragraph, then, unless otherwise ordered by the court, all payments under this
> paragraph as to that collateral will cease, and all secured claims based on that
> collateral will no longer be treated by the plan.

The only item of collateral listed in section 3.1 of the Plan is the Hermitage Property.

In order to determine how to enforce this provision, the court must decide what it means.

The City argues that following relief from the stay as to any item of collateral listed in section

3.1, payments cease only for those creditors listed in section 3.1.  While all other claims secured

by that collateral will no longer be treated by the plan, that language "is not intended to, and does

not operate to, cease payments under other paragraphs of the Plan."  Motion, p. 7.

### C.  What Does the Plan Mean?

In analyzing this language in Form 113 and in this Plan, the parties both urge the court to

use a statutory construction analysis.  The City asserts that the canons of statutory construction

apply to the Federal Rules, and that Form 113 is part of the Federal Rules, "and thus those

canons apply with full force to its text."  Motion, p. 6.  The Trustee cites several cases that

engage in statutory analysis, and so assumes without discussion that the rules of statutory

construction apply.  *See* Response, p. 8.

13

### 1. How to interpret a chapter 13 plan

It is undisputed that courts use the principles of contract interpretation to analyze confirmed plans of reorganization in chapter 11 cases. *See In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) ("Principles of contract law apply to interpreting a plan of reorganization[.]"); *Iberiabank v. Geisen* (*In re FFS Data, Inc.*), 776 F.3d 1299, 1304 (11th Cir. 2015).

"The law governing the interpretation of a confirmed chapter 13 plan," however, "is surprisingly unsettled." *In re Terrell*, 637 B.R. 129, 135 (Bankr. E.D. Wis. 2021). *See In re Turner*, 558 B.R. 269, 280 (Bankr. N.D. Ill. 2016) ("it is far from clear that a Chapter 13 plan is as analogous to a contract as is a Chapter 11 plan"). After a review of this unsettled landscape of plan interpretation, the *Terrell* court concluded:

> The upshot of all this seems to be that, in construing a confirmed chapter 13 plan, a court ordinarily ought to focus on the plan as written, give its terms their plain or ordinary meaning based on what a reasonable person in the appropriate community of bankruptcy practitioners would have understood them to mean under the relevant circumstances, and turn to extrinsic evidence or other aids to construction only to the extent necessary to discern that meaning or to resolve genuine ambiguities in the text.

*Id.* at 138. This court agrees.

To focus on the Plan as written, and to give words their plain meaning, not only makes sense but also comports with Illinois law on contract interpretation. The plain meaning of a contract's language governs its interpretation by Illinois courts. *See Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) ("Under Illinois law … contract terms are interpreted according to their plain meaning unless otherwise defined.") (*citing Trade Center v. Dominick's Finer Foods*, 711 N.E.2d 333, 335 (Ill. 1999)). If the meaning is clear, the court's inquiry is over. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999)

14

("If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence.").

### 2.    Plain meaning

The plain meaning of the words in a document is the start, and perhaps the end, of the process of interpreting that document.  This is true not just for contracts, but for statutes and rules as well.  *See, e.g., Pavelic & LeFlore*, 493 U.S. at 123 ("We give the Federal Rules of Civil Procedure their plain meaning, and generally with them as with a statute, when we find the terms ... unambiguous, judicial inquiry is complete[.]") (citation and quotation omitted); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (when "the statute's language is plain, the sole function of the courts is to enforce it according to its terms") (quotation omitted); *Caminetti*, 242 U.S. at 485 ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed[.]"); *In re Energy Future Holdings Corp.*, 990 F.3d 728, 739 (3d Cir. 2021) ("[W]here the language of the contract is unambiguous, the Court interprets the contract based on the plain meaning of the language contained on the face of the document.") (quotation omitted).

Therefore, the court will focus its inquiry on the plain meaning of the language at issue in section 3.1.

### 3.    The plain meaning of the words in section 3.1

The language at issue is the following:

> If relief from the automatic stay is ordered as to any item of **collateral** listed in this **paragraph**, then, **unless otherwise ordered** by the court, all **payments under this paragraph** as to that collateral will cease**, and all secured claims** based on that collateral will no longer be **treated** by the **plan**.

The court will review the plain meaning of each of the highlighted terms.

15

**Collateral** – section 3.1 contains a column with the heading "collateral." The Bankruptcy Code does not define collateral. "So we go to Article 9 of the Uniform Commercial Code [("UCC")], in force in Illinois as in every state[.]" *In re Howard*, 597 F.3d 852, 855 (7th Cir. 2010) (reviewing the definition of a purchase money security interest). According to the UCC, collateral "means the property subject to a security interest[.]" 810 ILCS 5/9-102(a)(12). There is no dispute that in the Plan, the "collateral" is the Hermitage Property.

**Paragraph** – section 3.1 is its own paragraph, as are sections 3.2, 3.3, 3.4 and 3.5. These five paragraphs together make up Part 3 of Form 113. For example, Form 113 provides in section 3.2 that "[u]nless otherwise ordered by the court, the amount of the creditor's total claim listed on the proof of claim controls over any contrary amounts listed in *this paragraph*." (Emphasis added.)

**Unless otherwise ordered** – sometimes courts do not have discretion to make a change from the status quo (or they must provide specific reasons for doing so, *see, e.g., Matter of Steenes*, 918 F.3d 554, 558 (7th Cir. 2019)). Form 113 anticipates that parties might ask the court to override the default. The Working Group had realized that "that the divergence in local practices called for parsimony when including items in the form." Advisory Committee Agenda April 2015, p. 80 ("April 2015 Agenda"). Allowing the court to "otherwise order" a different result could avoid an undesired consequence that might result from that parsimony.

**Payments under this paragraph** – section 3.1 is titled "[m]aintenance of payments and cure of default, if any." It provides that the debtor will continue with their *contractual installment payments*, which are either paid directly or by the trustee, and that the trustee will make *payments on any existing arrearage*. For each creditor in section 3.1, therefore, relief from stay as to their collateral will result in the cessation of one or perhaps two sets of payments.

16

**And** – this is an "elemental word[] in the English language" which writers use to "combine[] items."  Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Reading Law").  The drafters joined together the first and second parts of this sentence in section 3.1 with the conjunction "and," so that both parts of the sentence take effect. *See., e.g., United States v. Pace*, No. 21-2151, 2022 WL 4115728, at *9 (7th Cir. Sept. 9, 2022) (holding that an em-dash changed its meaning to the disjunctive in one part of a statute but acknowledging that "the word 'and' is commonly utilized conjunctively").

**All secured claims** – in addition to using the word "all," which encompasses every secured claim, the Plan uses the plural form of the word, "claims."  If the drafters meant for this provision to refer only to the secured claims listed in section 3.1, they knew just how to say that. At the beginning of this very paragraph, the Plan refers to "the secured claims listed below[.]" By contrast, this phrase uses the language, "all secured claims based on that collateral."

**Treated** – the Bankruptcy Code tells us that if a chapter 13 plan classifies claims, it "shall provide the same treatment for each claim within a particular class[.]" 11 U.S.C. § 1322(a)(3). As the Trustee points out, "[a] creditor secured by real estate can be treated many different ways within a confirmed plan."  Response, p. 4.

> Together, the provisions of §§ 1322 and 1325 give a Chapter 13 debtor who wishes to retain his home several options with respect to the *treatment* of a mortgage claim against the property. Under § 1322(b)(2), the debtor may choose to leave the rights of the mortgage holder unaffected; under § 1322(b)(5), if the final payment under the mortgage is due after the last plan payment, the debtor may cure arrearages through plan payments made to the trustee while maintaining postpetition mortgage payments either "through the plan" or directly to the mortgage holder; and, under § 1322(c)(2), if the mortgage loan matures during the plan period, the debtor may modify the loan and pay the secured portion of the loan over the plan period. Under § 1325(a)(5), the Court will confirm a plan containing any of these provisions.

*In re Park*, 532 B.R. 392, 395 (Bankr. M.D. Fla. 2015) (footnote omitted) (emphasis added).

Any of those options are examples of *treatment* of a claim.  Clearly, then, "treated by the plan"

goes beyond just payments.

**Plan** – the essence of chapter 13 is the plan, proposed by the debtor.  *See* 11 U.S.C. § 1321.

Form 113 uses the word "plan" at the end of this sentence, and not any of the words available to

designate less than the entire document, such as section, paragraph, part or provision.  Within

this sentence itself, the drafters used "paragraph" when referring to the collateral for which relief

from the stay might be ordered, and "plan" when referring to a change in treatment for all

secured claims based on that collateral.

### 4.  An alternative that changes the effect of the stay relief language in section 3.1

Section 8.1 of Form 113 provides for alternative treatment negotiated by the parties, so

long as it is consistent with the Bankruptcy Code.  Any secured creditor who wishes to negotiate

continued treatment by the plan after the court grants relief from the stay may do so.  The City

acknowledges that "non-standard provisions [in section 8.1] may affect any part of the plan."

Reply, p. 12.

For example, in *In re Tedesco*, the debtors proposed the following nonstandard provision

in their plan:

> Debtors are expressly proposing treatment for mortgage creditor Lakeview Loan
> Servicing that is contrary to plan paragraph 3.1 above. Debtors are proposing that
> confirmation shall override the following provision of paragraph 3.1: "If relief
> from the automatic stay is ordered as to any item of collateral listed in this
> paragraph, then, unless otherwise ordered by the court, all payments under this
> paragraph as to that collateral will cease, and all secured claims based on that
> collateral will no longer be treated by the plan."

> The Confirmation order shall serve as an order by the Court for the Trustee to
> continue payments under paragraph 3.1, and the secured claims based on that
> collateral shall continue to be treated by the plan, even though creditor has
> obtained relief from stay. Debtors have tendered several post-petition payments to
> creditor Lakeview Loan Servicing, and creditor has accepted those payments.

18

> Debtors will continue to fund their plan and their plan shall cure the pre-petition mortgage arrearage. The residence is necessary for the Debtors [sic] successful reorganization, and creditor Lakeview Loan Servicing shall be bound by the confirmed plan to accept such payments as to allow the debtors to cure their mortgage arrearage through the Chapter 13 plan, and continue to accept ongoing monthly payments directly from the Debtors.

No. 19-21421, 2020 WL 7133168, at *1 (Bankr. E.D. Ky. Nov. 20, 2020).

Lakeview Loan Servicing ("Lakeview") objected to confirmation of the Tedescos' plan. It did not object, however, on the grounds that the plan did not meet the confirmation requirements of § 1325(a).  Neither did it object on the basis that the plan could not require it to continue accepting payments after the court granted stay relief.  Instead, it argued that the plan impermissibly modified the stay relief order it had already obtained.  The *Tedesco* court found, however, that the proposed nonstandard provision did not modify Lakeview's stay relief order. "[R]ather, the Plan treats Creditor's claim in a manner consistent with §§ 1322 and 1325. The Plan's nonstandard provision requires the Trustee to keep making arrearage payments to Creditor notwithstanding the Stay Relief Order, which alters a term of the local form chapter 13 plan." *Id.*, at *3.

If a debtor or creditor wishes to contract around the result mandated by the language of section 3.1, it may do so by including a nonstandard provision.[5]  Indeed, the City has done so in the past, objecting to confirmation on the grounds that this language in section 3.1 places an

---

[5] *But see In re Malinowski*, No. 19 B 1454, 2019 WL 1504392 (Bankr. N.D. Ill. April 1, 2019) ("American Eagle asserts that its secured claim should remain intact upon stay modification but the form plan clearly states the opposite. Section 3.1 of the plan provides that '[i]f relief from the automatic stay is ordered as to any item of collateral listed in this paragraph, then, unless otherwise ordered by the court, all payments under this paragraph as to that collateral will cease, and all secured claims based on that collateral will no longer be treated by the plan.' Because Fed. R. Bankr. P. 9009(a) prohibits any alteration of official forms, that provision must remain intact as written. Secured creditors are not without a remedy, though, as the form plan language allows them to request further adequate protection beyond enforcement of state-law remedies as to their collateral in their motions for relief from stay. The court can determine then if additional relief is warranted. But Rule 9009(a) does not otherwise allow such changes to the form plan language.").  Here, the Plan does not *alter* the form.  As long as provisions are consistent with the Bankruptcy Code, paragraph 8.1 specifically provides the opportunity for parties to negotiate nonstandard provisions.

impermissible condition on payment of its claim, and then withdrawing that objection after the debtor added the following language to Part 8:

> Notwithstanding the language in section 3.1, if relief from stay is granted to any creditor as to the property in 3.1, the City of Chicago's claim as to the same property shall remain treated in the plan.

*In re Smith*, 21 B 8460, EOD 41 (Bankr. N.D. Ill. Nov. 1, 2021).

In this case, for whatever reason, the City did not negotiate a nonstandard provision with the Debtor. Consistent with the Plan, the City will not receive payments now that the court granted relief from stay as to its collateral; however, it retains its lien and can take steps to protect its interest.

**5.   The plain meaning approach does not render Form 113 unconfirmable**

Applying the plain meaning of paragraph 3.1 to the City's claim, the City argues, "would cause the national form plan to violate § 1325(a)(5)(B), making the national plan unconfirmable." Motion, p. 14. By allowing for termination of payments to a secured creditor before the creditor has received the allowed amount of its claim, Form 113 would not satisfy § 1325(a)(5)(B)(ii), which states that the court shall confirm a plan if, among other aspects of each secured claimant's treatment, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]"

This argument cannot succeed. The language in section 3.1 does not affect the value, as of the effective date of the plan, of property to be distributed under the Plan. The Debtor's confirmed plan proposed to pay the City the allowed amount of its claim. The fact that Form 113 anticipated a possible future situation in which the City – or any secured creditor – might not receive the allowed amount of its claim through the Trustee's disbursements does not affect the

20

Plan's confirmability on the effective date, and at the time the court entered the confirmation order.[6]

### 6. How other form plans in the Seventh Circuit treat secured creditors after the court orders relief from the stay

There are six other districts in the Seventh Circuit besides the Northern District of Illinois. Only one adopted Form 113; each of the others has their own form plan. Two of the five local form plans do not describe the effect of an order granting relief from the stay; the other three each use different language to describe the effect of a stay relief order:

**Central District of Illinois**. The form plan does not describe the effect of an order granting relief from the stay. Thus, the parties are left to craft the resulting effect through motion practice, a nonstandard provision or plan amendments.

**Southern District of Illinois**. Section 17 of the form plan provides that distribution to a secured creditor who obtains stay relief will stop upon entry of the order terminating the stay. The section continues: "Absent an Order of the Court, relief from the automatic stay shall also result in the Trustee ceasing distribution to all junior lien holders." In other words, all other creditors whose claims are secured by the same collateral will no longer receive distributions under the plan, if their lien is junior to the creditor that received relief from the stay.

**Northern District of Indiana**. This district adopted Form 113.

**Southern District of Indiana**. The form plan contains several paragraphs within section 2, which is titled "GENERAL PROVISIONS." Paragraph 2(f) provides that "[u]pon entry of an order lifting the stay, no distributions shall be made on any secured claim relating to the subject collateral until such time as a timely amended deficiency claim is filed by such creditor and

---

[6] Similarly, in a chapter 11 context, parties often negotiate post-confirmation cross-defaults between tranches of secured debt in the plan documents. Here, paragraphs 3.1, 3.2 and 8.1 provide the same opportunity to the City in a chapter 13 case.

21

deemed allowed, or the automatic stay is re-imposed by further order of the Court." This form plan does not use the phrase "all secured claims based on that collateral" but instead chose the words "any secured claim relating to the subject collateral." The effect appears to be similar to that in Form 113.

**Eastern District of Wisconsin**. As in Form 113, Part 3 of the Eastern District of Wisconsin's form plan treats secured claims. Introductory language at the beginning of Part 3 – which contains six subparts – applies "to subparts 3.1, 3.2, and 3.3." That language includes the following: "If a secured creditor obtains relief from the automatic stay as to collateral listed in this section, the trustee will cease further payments *to that creditor*, and, as of the date of entry of the order granting stay relief, the plan will be deemed not to provide for *that creditor's* secured claims[.]" (Emphasis added.) There are two items to notice in this paragraph. First, that the drafters used the words "that creditor," making it clear that stay relief only affects the creditor who obtains it. Second, the drafters distinguished between payments to the creditor by the trustee, and what the plan provides for the creditor's secured claims.

**Western District of Wisconsin**. The form plan does not describe the effect of an order granting relief from the stay. Thus, the parties are left to craft the resulting effect through motion practice, a nonstandard provision or plan amendments.

Each of the districts that has a unique form plan uses different language to describe the result of a stay relief order (or no language at all). Some provide for the treatment set forth in Form 113; some provide an alternative treatment; and some are silent, allowing the parties to address the issue in nonstandard provisions, or by motion practice. In each, as in Form 113, the parties have the opportunity to further negotiate an alternative to the default. Whether they do so or not, the plan is binding upon confirmation, and the language is clear.

22

**7.  Legislative history does not mandate a different conclusion**

    **a.  The City's argument**

The City contends that the language at issue in section 3.1 was added to "clarify that the reporting requirements under Rule 3002.1 for mortgage creditors listed in ¶ 3.1 of the plan would cease once the stay was lifted."  Motion, p. 9.  In support of this argument, the City refers to some of the history regarding amendments to Fed. R. Bankr. P. 3002.1.

Rule 3002.1 applies only in chapter 13 cases, and within those cases it applies only to claims that are secured by a security interest in the debtor's principal residence for which the plan provides contractual installment payments.  It requires notice of payment changes, fees, expenses, charges, and the final cure payment.  Rule 3002.1 also provides procedures for determination of certain items as well as consequences for a failure to provide the required notice.

As originally written, the limit on the Rule's application in chapter 13 cases was to: (1) claims secured by a security interest in the debtor's principal residence; and (2) claims provided for under § 1322(b)(5) of the Code in the plan.  This resulted in some confusion.  *See In re Tollios*, 491 B.R. 886, 887 (Bankr. N.D. Ill. 2013) ("At issue is whether Rule 3002.1 applies to cases in which the plan requires the debtors to make regular monthly payments under their mortgage loan agreement but does not provide for payment of pre-petition arrears to the mortgage creditor.").

The City noted in the Motion that the *Tollios* judge asked the Advisory Committee for clarification of this confusion regarding Rule 3002.1.  Motion, p. 8.  The Subcommittees on Consumer Issues and Forms ("Subcommittees") that considered this request recommended in a memorandum ("September Memorandum") to the Advisory Committee that Rule 3002.1 "be

23

amended to clarify that the rule applies to any chapter 13 plan that provides for the maintenance of home mortgage payments." Advisory Committee Agenda September 2013, p. 119 (emphasis deleted) ("September Agenda"). This would promote the policy behind Rule 3002.1's adoption: "If a debtor is trying to remain current on a home mortgage, he or she needs to know if the amount required to be paid has changed, whether or not an arrearage is being cured." September Agenda, p. 122. Rule 3002.1 was therefore amended in 2016 to clarify that:

> [i]ts provisions apply whenever a chapter 13 plan provides that contractual payments on the debtor's home mortgage will be maintained, whether they will be paid by the trustee or directly by the debtor. The reference to § 1322(b)(5) of the Code is deleted to make clear that the rule applies even if there is no prepetition arrearage to be cured. So long as a creditor has a claim that is secured by a security interest in the debtor's principal residence and the plan provides that contractual payments on the claim will be maintained, the rule applies.

Advisory Committee Notes to Fed. R. Bankr. P. 3002.1 (2016 Amendments).

At the same time – and more relevant to the City's argument – the Subcommittees discussed whether another amendment to Rule 3002.1 was needed to address a different issue. "Do the creditor's obligations under Rule 3002.1 cease to apply if the automatic stay is lifted with respect [to] the debtor's principal residence, and, if so, at what point is the creditor relieved of these obligations?" September Agenda, p. 124. The Subcommittees agreed that Rule 3002.1 should not apply when its purpose is no longer served but could not agree on whether that would occur on the effective date of an order terminating the stay or on transfer of title from the debtor. *Id.*

The Subcommittees noted that the "effective date" approach was "consistent with the proposed chapter 13 plan form," and it quoted a version of the language at issue in this opinion: "[I]f relief from the automatic stay is ordered as to any item of collateral listed in this paragraph, all payments under this plan as to that collateral will cease and all claims as to that collateral will no longer be treated by the plan." *Id.*, p. 125.

> Because Rule 3002.1(a) currently requires a home mortgage claim to be 'provided for in the debtor's plan' in order for the rule to apply, the proposed plan language is intended to render Rule 3002.1 no longer applicable after relief from the stay is granted.

*Id*.

The City concluded from this statement that "the language of the Plan providing that certain secured claims will 'no longer be treated by the plan' was to further clarify that the reporting requirements under Rule 3002.1 for mortgage creditors listed in ¶ 3.1 of the plan would cease once the stay was lifted.  That is its clear and unequivocal purpose, and that is what the provision does.  It has nothing to do with ceasing payments to creditors that are not listed in ¶ 3.1." Motion, p. 9.

**b.  No discussion of the purpose of this language by the Working Group**

The City's conclusion, however, is based on the September Memorandum, which was written by the Subcommittees on Consumer Issues and Forms for the purpose of examining Rule 3002.1.  It is not based on any commentary, history, memoranda or discussion *by the Working Group who drafted Form 113*, who presumably would have more accurate insight into the purpose for including this particular language in the plan.

Indeed, in its April 2, 2014 Memorandum regarding the National Chapter 13 Plan Form Project, the Working Group noted that after receiving comments, it would be making two changes to the proposed language of section 3.1, which originally read: "[I]f relief from the automatic stay is ordered as to any item of collateral listed in this paragraph, all payments under this plan as to that collateral will cease and all claims as to that collateral will no longer be treated by the plan."  Advisory Committee Agenda April 2014, p. 122 ("April 2014 Agenda").

One commenter had pointed out that under the proposed language, "the plan would not treat an unsecured deficiency claim as to the collateral for which the stay was lifted."  *Id.*  The

25

Working Group therefore altered the proposed language to provide that only "secured claims" would no longer be treated.  More relevant to this opinion, several commenters had explained that debtors might wish to continue making payments even after the stay is lifted.  The Working Group therefore changed the language of section 3.1 "to make clear that this result would be subject to contrary court order."  *Id.*, p. 123.  The plan drafters added the ability for parties to ask the court to make an exception to the default.

The City points to no discussion by the Working Group – and the court can locate none in the various Advisory Committee Agenda Books – of a dispute that all secured claims would no longer be treated by the plan after relief from the stay as to the collateral securing those claims.

### c. Issues with using legislative history

The City's argument highlights a flaw in using committee reports to show the intent of the drafters.  "In fact, the exercise of trying to divine intent from legislative statements (whether from floor speeches, debates, or committee reports) is a sort of fiction. *See Reading Law* at 394 ('The use of the term *legislative intent* encourages this search for the nonexistent.') And, the Court's objective its [sic] not to try and guess what hundreds of legislators might have meant but merely to construe the text they actually enacted." *In re Quadruple D Trust*, 639 B.R. 204, 234 (Bankr. D. Colo. 2022).  *See also Jeroski v. Fed. Mine Safety & Health Rev. Comm'n*, 697 F.3d 651, 655 (7th Cir. 2012) ("[R]eliance on legislative history, even on committee reports as distinct from stray comments by individual legislators, can be unrealistic too. One never knows how many legislators read committee reports, or if they do whether they agree with them or just with the statutory text."); *Barclay v. U.S. Dep't of Educ.*, No. 1:20-CV-2849-WMR, 2021 WL 6113658, at *2 n.2 (N.D. Ga. Sept. 15, 2021) ("[T]his Court notes that the committee reports can not possibly speak to the intent of all the members of Congress and as to why such Senators and

26

Representatives voted for this text. But, we do know they voted for this text, and *we know what the ordinary meaning of the text is*.) (Emphasis added). *But see Digital Realty Trust, Inc. v. Somers*, ___ U.S. ___, 138 S. Ct. 767, 782 (2018) (Sotomayor, J., concurring) ("Committee reports, like the Senate Report the Court discusses here, are a particularly reliable source to which we can look to ensure our fidelity to Congress' intended meaning.") (citation omitted).

The Supreme Court has emphasized the importance of a document's plain meaning while cautioning against reliance on legislative history:

> It must be acknowledged that, under our reading of the text, the word "attorney" in subsection (A) may well be surplusage…. That is not controlling, however. Surplusage does not always produce ambiguity and our preference for avoiding surplusage constructions is not absolute. Where there are two ways to read the text—either attorney is surplusage, in which case the text is plain; or attorney is nonsurplusage (i.e., it refers to an ambiguous component in § 330(a)(1)), in which case the text is ambiguous—applying the rule against surplusage is, absent other indications, inappropriate. We should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history.

*Lamie*, 540 U.S. at 536 (citation omitted).

### d. Resolution of dispute over when Rule 3002.1 ceases to apply

If the September Memorandum demonstrates anything, it is that there was disagreement among the Subcommittees' members regarding the exact point in the relief from stay process at which the notification requirement under Rule 3002.1 should cease to apply. The Subcommittees presented the issue for discussion by the Advisory Committee, seeking guidance on the appropriate direction. September Agenda, p. 128. The Advisory Committee eventually recommended using the effective date approach, April 2014 Agenda, p. 38, and that recommendation was adopted into the amended Rule 3002.1. The Rule now provides that "[u]nless the court orders otherwise, the notice requirements of this rule cease to apply when an order terminating or annulling the automatic stay becomes effective with respect to the residence

that secures the claim." The Advisory Committee Notes to the 2016 Amendments explain that "[d]ebtors and trustees typically do not make payments on mortgages after the stay relief is granted, so there is generally no need for the holder of the claim to continue providing the notices required by this rule."

### e. The Plan is different from Rule 3002.1

The language of Form 113 regarding the effect of stay relief is different than the narrower language in Rule 3002.1. Issues regarding Rule 3002.1, such as the question addressed in *Tollios* and the dispute over when the notice requirements no longer apply, were addressed *by amending the Rule*. The drafters of Form 113 did not amend the proposed form plan to address those issues. The language of Form 113 is broader than Rule 3002.1 and addresses all aspects of the treatment of secured claims. Various form plans in other districts demonstrate how a form can be drafted differently to affect this issue, and how the question of the treatment of secured claims by the plan after relief from the stay is not *necessarily* related to Rule 3002.1.

In this particular case, the parties did not negotiate a different treatment for secured claims if relief from stay were granted, as they had the ability to do. Not only could the parties have contracted for different treatment in section 8.1, but they could also have requested that the court order a change from the form plan's consequence at the time stay relief was granted. Recall that Form 113 provides only that "all secured claims based on that collateral will no longer be treated by the plan" as the default provision. Secured claims may continue to be treated by the plan if "otherwise ordered by the court[.]" The City took advantage of neither of these options; it did not contract for alternative treatment in section 8.1, and it did not request that the court order other treatment upon stay relief.

28

**D. Is the Plan Enforceable?**

The language of Form 113 in section 3.1 is clear.  Its plain meaning is unambiguous.  In the introductory language of Part 1, the Plan clearly provided notice of creditors' right to object: "If you oppose the plan's treatment of your claim *or any provision of this plan*, you or your attorney must file an objection to confirmation at least 7 days before the date set for the hearing on confirmation[.]" (Emphasis added.)  The City did not object to confirmation, nor did it negotiate a nonstandard provision in section 8.1.  The court confirmed Debtor's Plan on December 9, 2019.  More than two years later, the City brought this Motion, objecting to a Plan term.

### 1.  Confirmation binds the parties

The language of the Bankruptcy Code is clear that confirmation of a chapter 13 plan creates a binding agreement among the parties to it.  "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."  11 U.S.C. § 1327(a).  *See In re Parmenter*, 527 F.3d 606, 608 (6th Cir. 2008) ("Ford, like all creditors and the debtor, is bound by the terms of a confirmed plan[.]").

> It is a well-established principle of bankruptcy law that a party with adequate notice of a bankruptcy proceeding cannot ordinarily attack a confirmed plan. The reason for this is simple and mirrors the general justification for *res judicata* principles—after the affected parties have an opportunity to present their arguments and claims, it is cumbersome and inefficient to allow those same parties to revisit or recharacterize the identical problems in a subsequent proceeding.
>
> This is especially true in the bankruptcy context, where a confirmed plan acts more or less like a court-approved contract or consent decree that binds both the debtor and all the creditors. Bringing the various creditors' interests to the table once is difficult enough; permitting one of the creditors to launch a later attack on a confirmed plan would destroy the balance of interests created in the initial proceedings.

*In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000) (citations omitted).

As one commentator wrote:

> Upon becoming final, the order confirming a chapter 13 plan represents a binding determination of the rights and liabilities of the parties as ordained by the plan. Absent timely appeal, the confirmed plan is *res judicata* and its terms are not subject to collateral attack. The *res judicata* effect of confirmation may be eliminated only if confirmation is revoked, or if the case is later dismissed or converted to another chapter.

8 Collier on Bankruptcy ¶ 1327.02 (16th 2022) (footnotes omitted).

### 2. **Principles of *res judicata* apply**

As the *Harvey* panel wrote, the justification for the binding nature of a confirmed plan is similar to that for *res judicata*. Indeed, "a confirmed plan, once final, is *res judicata* and its terms are not subject to collateral attack." *McDaniel v. Navient Solutions, LLC* (*In re McDaniel*), 973 F.3d 1083, 1089 (10th Cir. 2020) (quotation omitted). "Confirmation has preclusive effect, foreclosing relitigation of any issue actually litigated by the parties and any issue necessarily determined by the confirmation order." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015) (quotation omitted).

Debtor served the City with the Plan. It had the opportunity to review the Plan and to object to its treatment, including the provision affecting all secured claims' treatment under the plan when relief from stay is granted as to the collateral securing their claims.

In a similar context, when discussing the applicability of Fed. R. Civ. P. 60(b)(4) to an attack on a confirmed plan, the Supreme Court wrote:

> United had actual notice of the filing of Espinosa's plan, its contents, and the Bankruptcy Court's subsequent confirmation of the plan. In addition, United filed a proof of claim regarding Espinosa's student loan debt, thereby submitting itself to the Bankruptcy Court's jurisdiction with respect to that claim. United therefore forfeited its arguments regarding the validity of service or the adequacy of the Bankruptcy Court's procedures by failing to raise a timely objection in that court.

*Espinosa*, 559 U.S. at 275 (citation omitted).

In the Motion, the City asks the court to enforce the confirmation order and the Plan by deeming certain language ambiguous and interpreting that language as the City wishes it to be read. This request must fail. The plain meaning of the Plan's terms are clear, not ambiguous. There is nothing to interpret. Moreover, the City did not seek review of the Plan prior to confirmation by objecting to this provision, and then appealing any adverse decision. The time for review has passed.

## V.     CONCLUSION

Although the City may wish to pursue a different approach, the language of the Plan is clear, its plain meaning is unambiguous and it is binding. The City is not left without a remedy. It can negotiate a modified treatment of its claim before confirmation in future cases, it can ask the court to "order otherwise" when stay relief is granted as to its collateral, or it can request that the Judicial Conference consider revising the language of Form 113. This last option, however, is not an exercise for this court. The court will enter an order denying the Motion.

Date:   September 30, 2022

DAVID D. CLEARY
United States Bankruptcy Judge

31